PER CURIAM.
¶ 1 Mary Zehowski appeals a divorce judgment that terminated her marriage to Timothy Peterson. She contends, for various reasons, that the circuit court erroneously exercised its discretion when dividing the parties' property.[1] We reject Zehowski's arguments, with two exceptions. Specifically, we agree with Zehowski that the circuit court erred by including her premarital Target 401(k) in the property division, and by failing to include the value of Peterson's wedding ring. We therefore affirm the divorce judgment in part, reverse in part, and remand for the circuit court to re-equalize the property division after excluding Zehowski's Target 401(k) and including the value of Peterson's wedding ring.
BACKGROUND
¶ 2 Zehowski and Peterson began living together in June 2004 and were married in September 2009. Both parties brought property to the marriage, and the circuit court found that they each made "a substantial amount of money." They did not enter into a prenuptial agreement.
¶ 3 Zehowski petitioned for divorce in August 2015, after nearly six years of marriage. The parties did not have any children together, and they both agreed to waive maintenance. Consequently, the only disputed issue during the divorce proceedings was the division of the parties' property.
¶ 4 A six-day trial commenced on January 11, 2017, and concluded on August 16, 2017. The circuit court granted the parties a judgment of divorce on the first day of trial. In October 2017, each party submitted a proposed findings of fact, conclusions of law, and judgment (hereinafter, "proposed judgment"), along with a net worth statement. The circuit court adopted Peterson's proposed judgment verbatim. At our request, the court subsequently entered an amended judgment, which clarified that the "Exhibit A" referenced in the court's original judgment was Peterson's net worth statement. The net result of the property division was that Peterson was required to make an equalization payment of $71,750.83 to Zehowski. Zehowski now appeals, arguing the court erroneously exercised its discretion in various ways. Additional facts are included below.
DISCUSSION
¶ 5 The division of property at divorce is entrusted to the circuit court's discretion and will not be disturbed on appeal absent an erroneous exercise of discretion. LeMere v. LeMere , 2003 WI 67, ¶ 13, 262 Wis. 2d 426, 663 N.W.2d 789. A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a demonstrated rational process to reach a reasonable conclusion. Id. A discretionary determination may involve both findings of fact and conclusions of law. Covelli v. Covelli , 2006 WI App 121, ¶ 13, 293 Wis. 2d 707, 718 N.W.2d 260. We review questions of law independently, but we will not overturn the circuit court's factual findings unless they are clearly erroneous. Id.
¶ 6 Here, Zehowski claims the circuit court erroneously exercised its discretion when dividing the parties' property by: (1) applying an incorrect presumption regarding the division of the marital estate; (2) erroneously dividing assets and liabilities that the parties acquired during the marriage; (3) treating the parties' respective assets and liabilities differently; and (4) adopting Peterson's proposed judgment verbatim, with no supporting analysis, even though that document was "riddled with errors and inconsistencies." (Capitalization omitted.) We address each of these arguments in turn.
I. Presumption regarding the division of the marital estate
¶ 7 WISCONSIN STAT. § 767.61 (2015-16),[2] governs the division of property at divorce. The statute provides that certain property of the divorcing parties is not subject to division-specifically, property acquired by gift or by reason of another's death-unless refusal to divide that property will create a hardship on the other party or on the children of the marriage. Sec. 767.61(2). The statute then sets forth a presumption that all of the parties' other property should be divided equally. Sec. 767.61(3).
¶ 8 Zehowski argues the circuit court failed to follow the statutory procedure when dividing the parties' property in this case. She argues that, under WIS. STAT. § 767.61, the court should have included all of the parties' property in the marital estate, aside from gifted or inherited property, and should have then presumed that property would be divided equally. Instead, Zehowski contends the court improperly presumed that all property brought to the marriage was the individual property of the spouse bringing it and, therefore, was not subject to division.
¶ 9 As an initial matter, Zehowski's position on appeal appears to be inconsistent with the position she took in the circuit court. During the first day of trial, when discussing the parties' respective positions regarding the property division, the following exchange took place between the court and the parties' attorneys:
THE COURT: Presumption is we start the date of marriage.
[PETERSON'S ATTORNEY]: Correct.
THE COURT: So to overcome that you have to have some pretty good evidence.
[ZEHOWSKI'S ATTORNEY]: Correct. And that's what I need to get on the record, Your Honor.
Based on this exchange, it appears Zehowski conceded that the circuit court could presume the property each party brought to the marriage was not divisible. The doctrine of judicial estoppel prevents Zehowski from adopting an inconsistent position on appeal. See Olson v. Darlington Mut. Ins. Co. , 2006 WI App 204, ¶ 4, 296 Wis. 2d 716, 723 N.W.2d 713.
¶ 10 In any event, regardless of any concession by Zehowski that the circuit court could presume property brought to the marriage was not subject to division, we conclude the court properly exercised its discretion in that regard. By presuming that Peterson and Zehowski would each retain their premarital property, the court essentially deviated from an equal division of the parties' marital estate. A court may deviate from an equal division of the marital estate after considering the factors set forth in WIS. STAT. § 767.61(3)(a)-(m). Here, the court considered the relevant statutory factors when deciding to deviate from an equal division.[3]
¶ 11 For instance, the circuit court observed that Peterson and Zehowski had a "relatively short marriage of approximately 6 years." See WIS. STAT. § 767.61(3)(a). The court also noted that both parties "had accumulated substantial assets before their marriage to each other." See § 767.61(3)(b). The court further considered the parties' ages and health, observing they were both in their fifties, in good health, and able to support themselves. See § 767.61(3)(e). The court also considered the parties' earning capacities, finding they were well established in their careers and each made "a substantial amount of money." See § 767.61(3)(g). In addition, the court observed that both parties had waived maintenance. See § 767.61(3)(i).
¶ 12 Along with the factors discussed above, the circuit court also found it highly relevant that the parties had, for the most part, maintained economic independence during their marriage. See WIS. STAT. § 767.61(3)(m) (permitting a court to consider, in addition to the factors listed in paras. (a)-(L), "[s]uch other factors as the court may in each individual case determine to be relevant"). The court explained:
Although [the parties] did not enter into a prenuptial agreement, they strived during their marriage to, for the most part, maintain their separate financial identities. Each party earned their own income during the marriage and [they] were free to do with that income as they chose, without any restrictions on the use of their incomes placed on them by the other party. The parties never filed a joint tax return together and each was always responsible for paying their own taxes. The parties had their own credit cards and their own individual bank accounts.
¶ 13 After considering the factors set forth above, the circuit court determined it was appropriate
that each party be awarded the property that they brought to the marriage, together with any increases in the value thereof that occurred during the marriage; that each party be awarded any debt that they incurred prior to or during the marriage (except that the mortgage obligations on the Spooner WI Cabin and Florida home are joint obligations), and that generally, the Court's division of the property and debts comports with the financial independence exhibited by the parties during the marriage.
This determination was reasonable, in light of the parties' history of economic independence and the other statutory factors the circuit court considered. Accordingly, the court did not erroneously exercise its discretion when it deviated from an equal property division by presuming that both parties would retain the property they brought to the marriage.
II. Division of assets and liabilities acquired during the marriage
¶ 14 Zehowski next argues the circuit court erred in several respects when dividing the assets and liabilities the parties acquired during the marriage. We first address Zehowski's argument that the court erred by using an incorrect valuation date. We then turn to her arguments regarding specific assets and liabilities.
A. Valuation date
¶ 15 Zehowski argues the circuit court erred by valuing the parties' marital assets and liabilities as of the date of divorce-January 11, 2017. She explains that, although the parties were granted a divorce on that date, "[t]he last day of trial did not take place until over seven months later, and [j]udgment was not entered until nine months later." Zehowski asserts that, in the interim, the parties "continued paying for assets they had shared or obtained during the marriage." She therefore contends "a third date becomes important: the date the [p]arties financially separate-which has not yet happened."
¶ 16 We reject this argument for two reasons. First, immediately after the circuit court granted the parties a divorce on January 11, 2017, the following exchange took place between Peterson's attorney and the court:
[PETERSON'S ATTORNEY]: Judge, just for the record, I suppose the Court should make a finding, although it goes without saying, that today is the date for the determination of the property values.
THE COURT: Absolutely, yep.
[PETERSON'S ATTORNEY]: Okay. Because neither [Zehowski's attorney] nor I want to update financial statements again.
THE COURT: No that's-today's the date.
[PETERSON'S ATTORNEY]: All right. Good. Thank you.
THE COURT: Similar for the value of the house and stuff like that, too.
[PETERSON'S ATTORNEY]: Correct.
Zehowski did not object to the court's ruling that the parties' assets and liabilities would be valued as of January 11, 2017. As such, she has forfeited her right to raise that argument on appeal. See Tatera v. FMC Corp. , 2010 WI 90, ¶ 19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810.
¶ 17 Second, it is "settled law" in Wisconsin that assets are valued for purposes of property division as of the date divorce is granted. Holbrook v. Holbrook , 103 Wis. 2d 327, 334, 309 N.W.2d 343 (Ct. App. 1981). "In the absence of exceptional intervening circumstances, we are not at liberty to conclude that some other date should have been used." Id. (footnote omitted). Zehowski does not develop any argument explaining why the circumstances of this case were so "exceptional" as to require a valuation date other than the date of divorce. Her argument that the circuit court should have used some other date when valuing the parties' assets and liabilities therefore fails.
B. Zehowski's arguments regarding specific assets and liabilities
¶ 18 Zehowski next argues that the circuit court erred in various ways when dividing specific assets and liabilities the parties acquired during the marriage. First, she challenges the court's treatment of the parties' Florida home. The court found that the Florida home was worth $990,000 at the time of divorce and was encumbered by $560,783 in mortgage debt. Thus, the parties' total equity in the property at the time of divorce was $429,217. The court concluded that equity was marital and should be divided equally between the parties, except that Peterson should be awarded, "as individual property," the value of a $222,230.95 down payment he made on the Florida home, as well as $55,641.51 he had paid for improvements to the property.
¶ 19 Zehowski argues the circuit court erred in this regard because there was "no testimony or evidence whatsoever that Peterson's down payment was from anything other than resources derived during the marriage." Peterson testified at trial that the entire down payment for the Florida home "came from [him]" and no portion of the payment came from Zehowski. In arguing to the contrary, Zehowski cites her own testimony that Peterson wrote the check for the down payment from his business line of credit. The circuit court treated the business's increased value during the marriage as marital property. It therefore included that amount in the property division and awarded it to Peterson. Zehowski apparently contends that, had Peterson not used money from his business line of credit to make the down payment on the Florida property, the business's value would have been $222,230.95 higher at the time of divorce, resulting in a higher amount being allocated to Peterson for the business in the property division.
¶ 20 The divorce judgment, as a whole, does not support Zehowski's analysis. Although the circuit court treated the increased value of Peterson's business during the marriage as marital property, the court concluded, as a general matter, that it was "appropriate that each party be awarded the property that they brought to the marriage, together with any increases in the value thereof that occurred during the marriage." The court further found that each party contributed to the expenses associated with the Florida property "from their individual income." The court also found that each party "earned their own income during the marriage and were free to do with that income as they chose."
¶ 21 Zehowski does not cite anything in the record indicating that the business funds Peterson used for the down payment on the Florida property were treated as a debt from Peterson to the business in the business's valuation. Those funds would therefore be treated as a distribution to Peterson and would thus be income to him. On this record, the circuit court could reasonably determine that the down payment was made from Peterson's individual property, either because he brought the business to the marriage or because the distribution from the business was his individual income. Although the court's treatment of the down payment appears somewhat inconsistent with its decision to treat the business's increased value during the marriage as marital property, that inconsistency favors Zehowski because the increased value was awarded to Peterson in the property division. The court could have instead treated the business and its increased value as Peterson's individual property, consistent with its treatment of the parties' other premarital assets, in which case the court would have excluded the business's value from the property division altogether.
¶ 22 Zehowski next argues the circuit court erred by giving Peterson credit for amounts he spent on improvements to the Florida property. She does not contest the amounts Peterson paid, nor does she argue that those amounts were paid from marital funds. Instead, she argues giving Peterson credit for the cost of the improvements "is an unfair double-counting" because the parties' equity in the home "presumably" already reflected those improvements.
¶ 23 Zehowski's "double-counting" argument lacks merit. During the marriage, Peterson made individual contributions to the Florida property that benefitted both parties by increasing the home's value and, as a result, increasing their equity in the home. The circuit court could reasonably conclude that, because those improvements were paid for using Peterson's individual funds, it was necessary to give Peterson a credit for his individual contributions when dividing the parties' equity in the property. We agree with Peterson that recognizing the "increase in equity from the home improvements is different [from] recognizing [Peterson's] significant individual financial contribution that went into the ... improvements."
¶ 24 Zehowski also argues that the circuit court erred in its treatment of the Florida home because Zehowski "continues to be required to make mortgage payments" on that property, but the court did not give her any credit for those payments in the property division. However, Zehowski does not provide any record citations in support of her claim that she remains responsible for mortgage payments on the Florida home. Moreover, the divorce judgment expressly states that Peterson "shall be responsible for the mortgage on the [Florida] property."
¶ 25 Zehowski also complains that the divorce judgment did not "referenc[e] the dollar amount left on the [Florida property's] mortgage or how much the [p]arties paid down the mortgage during the marriage." She does not explain, however, why she believes the court was required to include those amounts in the divorce judgment. The Florida home was purchased during the marriage, and any reduction of the mortgage debt during the marriage was necessarily reflected in the mortgage balance stated in the divorce judgment. Zehowski does not cite any authority for the proposition that the divorce judgment was required to identify the change in the mortgage balance between the time of purchase and the time of divorce.
¶ 26 Zehowski also argues the circuit court erred in its treatment of the parties' Houlton, Wisconsin, home. It is undisputed that Peterson purchased the land where the Houlton home is located and built the home before marrying Zehowski. The circuit court found that Peterson "bought the lot with premarital funds for $127,000 and made a cash down payment upon completion of construction of the home in the amount of $245,440.88 for a total contribution to the home in the amount of $372,440.88 from his individual funds before the marriage." The court further found that, as of the date of divorce, the home was worth $578,000 but was encumbered by $428,659 in debt.[4] The court therefore found that the equity in the home at the time of divorce-$149,341-was less than Peterson's equity at the time of the marriage.
¶ 27 Based on this finding, the circuit court awarded the Houlton home to Peterson for no value. The court stated it was "appropriate ... to vary from an equal division" of the Houlton home in light of Peterson's premarital contributions to the home's equity. On appeal, Zehowski has not demonstrated that any of the circuit court's factual findings regarding the Houlton home are clearly erroneous, or that the court erroneously exercised its discretion by dividing the home unequally. Zehowski's assertion that the parties paid $71,000 toward the debt on the Houlton home during the marriage does not change the fact that the equity in the home actually decreased between the date of marriage and the date of divorce.
¶ 28 Zehowski next argues the circuit court "wrongly assigned to [her] one-hundred percent of the credit card debt she incurred during the marriage for the benefit of the marriage, without finding marital waste." (Capitalization omitted.) She contends that, absent a showing of waste, "any liabilities incurred ... are subject to equal division between spouses upon divorce."
¶ 29 This argument rests on a false premise. Although an equal division of marital debts is presumed at the time of divorce, a court may deviate from an equal division after considering the factors set forth in WIS. STAT. § 767.61(3). See Covelli , 293 Wis. 2d 707, ¶ 29 (construing a predecessor statute to § 767.61(3) ). Waste is merely one factor a court may consider when dividing the parties' debts. See Anstutz v. Anstutz , 112 Wis. 2d 10, 13, 331 N.W.2d 844 (Ct. App. 1983) (observing that "waste" falls under the statutory factor permitting a court to consider each party's contributions to the marriage). Contrary to Zehowski's assertion, a finding of waste is not required in all cases to support an unequal division.
¶ 30 Here, the circuit court assigned Zehowski and Peterson their respective credit card debts and declined to include those amounts in the property division. The court found that, during the marriage, "each party earned a substantial income and therefore had sufficient funds to pay their obligations as they came due." The court acknowledged that Zehowski had significantly more credit card debt than Peterson, but it observed she "came to the marriage with credit card and other debt not that dissimilar from the credit card debt that existed at the time of the filing of the divorce."[5] The court further found that Zehowski "substantially increased" her credit card debt between the time she petitioned for divorce and the time of trial, and Peterson "should not be held responsible for that debt." Finally, the court found that Zehowski "may have wasted marital assets" during the pendency of the divorce proceedings, based on testimony that she was "a gambler" and "took approximately six ... vacations to Florida, a trip to Mexico, [and] a trip to Nashville, Tennessee, as opposed to paying her credit card debts."
¶ 31 Ultimately, the court found it was
incredible that [Zehowski] earned nearly $300,000 per year during the last number of years, received the proceeds of a personal injury settlement, received in excess of $70,000 from the sale of a piece of property in Lino Lakes, Minnesota and took $40,000 from an IRA (contrary to the Temporary Order in this divorce) in 2016, yet still managed to accumulate substantial credit card debt.
The court further stated it "[did] not believe" Peterson was aware of Zehowski's increasing credit card debt because "the parties had a separate financial existence," and the court did not believe Zehowski told Peterson about the debt.
¶ 32 On this record, the circuit court did not erroneously exercise its discretion by making Zehowski responsible for her own credit card debt. The court considered relevant statutory factors when making that determination, specifically: (1) each party's contributions to the marriage, including Zehowski's possible waste of marital assets, see WIS. STAT. § 767.61(3)(d) ; (2) Zehowski's income and resultant ability to pay her credit card debts, see § 767.61(3)(g), (m) ; (3) the parties' history of financial independence, see § 767.61(3)(m) ; and (4) the fact that Zehowski incurred additional credit card debt after petitioning for divorce, see § 767.61(3)(m).[6] Based on these factors, the court could reasonably conclude that Peterson should not be responsible for Zehowski's credit card debt.
¶ 33 Zehowski nevertheless argues the circuit court erred because she testified "that she incurred her credit card debt paying for the majority of the [p]arties' normal living expenses, including large expenses for furnishing the[ir] three homes." However, the court expressly found Zehowski's testimony as a whole incredible, noting she "actively misl[ed] the Court about a number of issues." The court further explained that Zehowski's "lack of credibility was an important factor in the Court's decision on property division issues." "When the circuit court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and the weight to be given to each witness's testimony." State v. Peppertree Resort Villas, Inc. , 2002 WI App 207, ¶ 19, 257 Wis. 2d 421, 651 N.W.2d 345. The court was therefore free to reject Zehowski's self-serving explanation regarding her credit card debt.[7]
¶ 34 Zehowski next argues the circuit court erred in its treatment of two of her retirement accounts. First, the court concluded Zehowski's Fidelity IRA ending in 2073 was worth $62,298.74 in September 2015. Exhibit A to the divorce judgment shows that the court deducted the IRA's premarital value-$28,812.66-from that amount and then made an additional twenty-five-percent reduction, which Zehowski refers to as a "taxable asset" deduction.[8] The court then assigned the IRA's remaining value-$25,114.56-to Zehowski. Zehowski argues the court erred because there was evidence showing that, as of January 3, 2017, the IRA had a value of only $23,376.26, which was less than its premarital value. Zehowski therefore argues she should have been awarded "a zero balance or a negative balance" for the 2073 IRA.
¶ 35 Zehowski neglects to mention, however, that the decline in the 2073 IRA's value between September 2015 and January 2017 was not caused by market forces. Instead, the circuit court found that during that time period, Zehowski withdrew $40,000 from the IRA. The court further found that the withdrawal violated a temporary order entered in September 2015. In her reply brief, Zehowski contends she withdrew these funds from the IRA "to pay liabilities incurred during the marriage for the benefit of the marriage." However, she cites no evidence in support of that assertion. On this record, we cannot conclude the circuit court erroneously exercised its discretion by choosing to value the 2073 IRA as of September 2015, rather than January 2017.
¶ 36 Zehowski also challenges the circuit court's treatment of her Fidelity IRA ending in 7608. First, she argues that IRA was completely premarital and therefore should have been excluded from the property division. In the alternative, she argues the court erred by allocating $37,783.21 to her for the 7608 IRA.[9] She claims it is "not clear from the record" where that value came from, and she contends the court should have instead allocated her $18,642.62.
¶ 37 Neither of Zehowski's arguments regarding the 7608 IRA is persuasive. As Peterson correctly notes, Zehowski's position regarding whether the 7608 IRA had a marital component changed repeatedly during the divorce proceedings. Given Zehowski's inconsistent positions, and the circuit court's general finding that she was not credible, the court acted within its discretion by simply including the full value of the 7608 IRA in the property division. Moreover, while Zehowski asserts it is "not clear" from where the court's valuation of $37,783.21 came, Zehowski submitted multiple exhibits at trial indicating that was the IRA's value in January 2017.
¶ 38 Finally, Zehowski argues the circuit court erred by using Peterson's values for three of her bank accounts instead of her own, more up-to-date values. She contends her updated values "reflect the reality that her accounts had been significantly depleted in the weeks ahead of trial." The court could reasonably conclude, however, that Zehowski's withdrawal of over $21,000 from the relevant accounts during the month leading up to trial constituted an impermissible dissipation of assets, which justified the use of Peterson's earlier valuation dates. Although Zehowski claims Peterson agreed at trial to update the values he used for her bank accounts, the record does not support that assertion. In addition, while Zehowski contends she "likely" used the funds in question to pay down credit card debt that she incurred during the marriage, the document she cites as proof of that assertion does not clearly support it. The court was therefore free to reject Zehowski's explanation for the withdrawals.
III. Inconsistent treatment of the parties' respective assets and liabilities
¶ 39 Zehowski next argues that the circuit court erroneously exercised its discretion by "treating the parties' respective assets and liabilities differently." (Capitalization omitted.) For instance, she argues the court erred by giving Peterson credit for amounts he spent to improve the parties' Florida home but failing to credit her for "roughly $30,000" that she spent on "furnishings and various home goods for the residence." However, the record shows that Peterson paid for permanent improvements to the Florida home that increased the property's value, such as sidewalk pavers, window shutters, and a pool screen. These improvements are not comparable to the furnishings and home goods Zehowski paid for, which did not add value to the property. As such, the court properly treated the parties' expenditures on the Florida property differently.
¶ 40 Zehowski also argues the circuit court erred by failing to acknowledge that she paid for the majority of the parties' living expenses at the Houlton home. She contends the court should have "compensated" her for those expenditures in the property division. In response, Peterson asserts that he paid for the majority of the parties' living expenses at the Spooner cabin, and Zehowski does not argue otherwise in her reply brief. Under these circumstances, we agree with Peterson that the circuit court could reasonably conclude neither party was entitled to a credit in the property division for the payment of routine living expenses.
¶ 41 Zehowski's next argument relates to her Lino Lakes, Minnesota, home, which she purchased before marrying Peterson and sold during the marriage. The circuit court determined $39,741.92 of the proceeds from that sale were marital property, and it allocated that amount to Zehowski. Zehowski argues that if the court intended to return the parties' premarital assets to their original owners, it should have excluded all proceeds from the sale of the Lino Lakes home from the property division. However, Zehowski conceded in the circuit court that the proceeds from the sale of the Lino Lakes home included a marital component of $39,741.92. Accordingly, she cannot now argue the court erred by including that amount in the property division.
¶ 42 In the alternative, Zehowski argues the circuit court should have divided any marital portion of the sale proceeds from the Lino Lakes property equally between the parties. In response, Peterson argues the court properly allocated the marital portion of the sale proceeds to Zehowski because she "spent the entire amount during the pendency of the divorce action ... and [Peterson] did not receive any portion of those funds." Zehowski does not respond to this argument in her reply brief, and we therefore deem it conceded. See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp. , 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).
¶ 43 Next, Zehowski argues the circuit court erred in its treatment of a 2007 Suzuki motorcycle. The court found that the parties sold that motorcycle to Zehowski's son, who still owed them $3000 for the purchase. The court awarded that amount to Zehowski. Zehowski argues the court erred because her son purchased the motorcycle from Peterson without her knowledge. Peterson testified, however, that Zehowski "brokered the deal" with her son to purchase the motorcycle. The court clearly found Peterson's testimony regarding the sale more credible than Zehowski's. As such, we agree with Peterson that the court "had the discretion to assign the account receivable to either party." We further agree that, because the $3000 debt pertained to Zehowski's son, the court reasonably exercised its discretion by assigning that amount to Zehowski.
¶ 44 Zehowski also argues the circuit court erred by awarding her a 2010 Ski-Doo snowmobile at a value of $5000. The court determined it was appropriate to award that asset to Zehowski because she "gave [it] to her son." Zehowski argues that because the snowmobile belongs to her son, the court should not have included it in the property division. However, she does not cite any evidence indicating when she gave the snowmobile to her son or whether Peterson agreed to the gift. Under these circumstances, the court did not erroneously exercise its discretion by awarding the snowmobile's value to Zehowski.
¶ 45 Thus far, we have rejected each of Zehowski's arguments that the circuit court erroneously exercised its discretion by treating the parties' respective assets and liabilities differently. We now turn to the two areas in which we agree with Zehowski that the court erred.
¶ 46 First, Zehowski argues the circuit court erred by excluding Peterson's premarital RBC IRA from the property division but allocating to Zehowski the full value of her premarital Target 401(k). Zehowski argues there is no basis in the record to support this disparate treatment of the parties' premarital retirement accounts. We agree. Furthermore, Peterson concedes on appeal that the circuit court erred by including Zehowski's Target 401(k) in the property division.
¶ 47 Second, Zehowski argues the circuit court erred when it included her wedding ring in the property division but failed to include Peterson's wedding ring, which was valued at just over $3000. The divorce judgment does not contain any explanation for this discrepancy, and Peterson does not develop any argument that the court properly exercised its discretion in this regard. We therefore agree with Zehowski that the court erred by including her wedding ring, but not Peterson's ring, in the property division. Because of that error-and the court's additional error regarding Zehowski's Target 401(k)-we reverse the divorce judgment in part. We remand for the circuit court to re-equalize the property division after excluding Zehowski's Target 401(k) and including the value of Peterson's wedding ring.
IV. Adoption of Peterson's proposed judgment
¶ 48 Finally, based on Trieschmann v. Trieschmann , 178 Wis. 2d 538, 504 N.W.2d 433 (Ct. App. 1993), Zehowski argues the circuit court erred by adopting Peterson's proposed judgment verbatim. In Trieschmann , the husband and wife submitted posttrial briefs setting forth their positions on property division, maintenance, and other contested issues. Id. at 540-41. On appeal, we concluded the circuit court erroneously exercised its discretion by adopting the wife's brief in its entirety, without providing any supporting analysis. Id. at 541-42. We explained the court had "failed to articulate the factors upon which it based its decision" because the wife's brief was "devoid of any explanation or reasoning as to why the court accepted [the wife's] views regarding the disputed facts and law over [the husband's] views." Id. at 542.
¶ 49 The same is not true here. In this case, although the circuit court adopted Peterson's proposed judgment verbatim, that document properly set forth the relevant facts and law. Moreover, unlike the wife's brief in Trieschmann , Peterson's proposed judgment contained a well-reasoned rationale for its conclusions. As such, the court's decision to adopt Peterson's proposed judgment does not run afoul of Trieschmann .
¶ 50 Zehowski also argues the circuit court erred because Peterson's proposed judgment was "riddled with errors and inconsistencies." (Capitalization omitted.) Her argument in this regard reasserts a number of the alleged errors that we addressed above. We will not repeat our discussion of those issues here. We instead limit our discussion to the two new errors Zehowski raises with respect to the divorce judgment.
¶ 51 First, Zehowski argues the divorce judgment is inconsistent with the attached Exhibit A because Exhibit A addresses the proceeds from the sale of Zehowski's Lino Lakes home, but the divorce judgment does not. This argument is unavailing because the divorce judgment expressly incorporates Exhibit A. Moreover, it is Exhibit A, not the divorce judgment, that sets forth the amounts and calculations ultimately used to determine the equalization payment. Under these circumstances, the fact that the divorce judgment itself does not address the sale proceeds from the Lino Lakes home provides no basis for us to reverse the circuit court's decision.
¶ 52 Second, Zehowski contends reversal is warranted because the divorce judgment "calculates the values of retirement accounts by subtracting the premarital value from the value near the date of divorce," but Exhibit A "applies an additional 25% discount." The parties appear to agree that the court applied this additional discount to account for future tax consequences. It is also undisputed that the court uniformly applied the same twenty-five percent discount to both parties' retirement accounts. Zehowski does not argue, as a general matter, that the court erred by applying the twenty-five percent discount; she merely contends the court erred by failing to include that discount in the divorce judgment itself, as opposed to Exhibit A. Again, however, the divorce judgment expressly incorporates Exhibit A, and the court used the amounts listed in Exhibit A to determine the equalization payment. The court's failure to include the twenty-five percent discount in the divorce judgment itself is therefore of no consequence.
CONCLUSION
¶ 53 For the reasons set forth above, we reject the vast majority of Zehowski's arguments regarding the circuit court's division of the parties' property. However, we agree with Zehowski that the court erroneously exercised its discretion by including her premarital Target 401(k) in the property division and excluding the value of Peterson's wedding ring. We therefore affirm the divorce judgment in part, reverse in part, and remand for the circuit court to re-equalize the property division after excluding Zehowski's Target 401(k) and including the value of Peterson's wedding ring.
¶ 54 No WIS. STAT. RULE 809.25(1) costs are awarded to either party.
By the Court. -Judgment affirmed in part; reversed in part and cause remanded with directions.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

In addition to filing a notice of appeal from the October 24, 2017 divorce judgment, Zehowski also filed a separate notice of appeal from a contempt order entered on October 10, 2017. However, in her appellate briefs, Zehowski argues only that the circuit court erred in dividing the parties' property. She does not develop any argument regarding the contempt order. We therefore address the divorce judgment only.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Although Wis. Stat. § 767.61(3) directs a circuit court to consider all of the factors listed therein before deviating from an equal division, "a circuit court's failure to address factually inapplicable statutory factors will not be an erroneous exercise of discretion." LeMere v. LeMere , 2003 WI 67, ¶ 26, 262 Wis. 2d 426, 663 N.W.2d 789.

Zehowski does not appear to dispute these figures on appeal.

Zehowski does not cite any evidence to contradict the circuit court's finding that she had roughly the same amount of credit card debt at the time of the parties' marriage as on the date she petitioned for divorce. Instead, she contends she had $64,798 in revolving and installment debt at the time of marriage and $201,885 in revolving and installment debt as of December 2016. However, Zehowski petitioned for divorce in August 2015, not December 2016. She does not cite any evidence to show how much debt she had in August 2015, or how much debt she incurred between that time and the date of divorce.

Notably, a temporary order entered approximately one month after Zehowski petitioned for divorce prohibited both parties from "making any further debts against the credit of the other" and expressly informed Zehowski that any debt she incurred after entry of the temporary order would be her sole responsibility.

Zehowski also cites her own trial testimony in an attempt to justify the amounts she spent on vacations and trips to casinos after she filed for divorce. Again, however, the circuit court expressly found Zehowski's trial testimony incredible. Moreover, we agree with Peterson that, even accepting Zehowski's testimony, it was "not unreasonable for the Court to conclude that the funds should have been used to pay down the substantial credit card debt rather than going on numerous vacations post filing."

As discussed in greater detail below, the divorce judgment itself did not reference any "taxable asset" deduction or reduce the 2073 IRA's value by an additional twenty-five percent. It merely deducted the IRA's premarital value from its value in September 2015.

In both the divorce judgment and the attached Exhibit A, the circuit court stated the value of the 7608 IRA was $37,783.21. However, on Exhibit A, the court applied an additional twenty-five percent discount. We address this discrepancy below.